# Illinois Official Reports

## Supreme Court

*In re Marriage of Turk*, 2014 IL 116730

| | |
|---|---|
| Caption in Supreme Court: | *In re* MARRIAGE OF IRIS TURK, Appellee, and STEVEN TURK, Appellant. |
| Docket No. | 116730 |
| Filed | June 19, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Statutory guidelines permit a child support award to a noncustodial parent where warranted by circumstances and the best interests of the child, such as where visitation expenses were incurred by a poorer but noncustodial parent. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. David Haracz, Judge, presiding. |
| Judgment | Appellate court judgment affirmed in part and reversed in part.<br>Circuit court judgment reversed.<br>Cause remanded with directions. |

Counsel on
Appeal

Howard M. Levine, Brian W. Reidy and David J. Zwaska, of Levine, Wittenberg, Shugan & Schatz, Ltd., of Tinley Park, for appellant.

Gail M. O'Connor, of O'Connor Family Law, PC, of Chicago, for appellee.

Justices

JUSTICE KARMEIER delivered the judgment of the court, with opinion.
Chief Justice Garman and Justices Freeman, Kilbride, and Burke concurred in the judgment and opinion.
Justice Theis specially concurred, with opinion, joined by Justice Thomas.

## OPINION

¶ 1      The issues in this case are (1) whether section 505 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/505 (West 2012)) permits a trial court to award child support to a noncustodial parent and (2) if so, whether the circuit court abused its discretion when it awarded $600 per month in child support to the noncustodial parent here in addition to requiring the custodial parent to pay additional medical and dental expenses for the children. The appellate court held that trial courts do have authority under the statute to order custodial parents to pay child support and found no abuse of discretion in the trial court's decision to increase the amount of medical and dental expenses the custodial parent in this case was required to pay. It concluded, however, that the record did not support the $600 per month child support award. It therefore reversed that portion of the trial court's judgment and remanded for an evidentiary hearing with instructions for the trial judge "to clearly explain the basis for any support awarded, as required by section 505 ***." For the reasons that follow, we affirm in part and reverse in part and remand to the circuit court.

¶ 2                            BACKGROUND

¶ 3      Iris and Steven Turk were married in October of 1993 and have two sons, Nathaniel, born in 1997, and Jacob, born in 1999. In 2004, Iris filed a petition in the circuit court of Cook County seeking dissolution of the marriage, division of the property, sole custody of the boys, and an award of maintenance and child support. Steven, in turn, filed a counter petition for dissolution requesting, among other things, that the award of custody be joint.

¶ 4      Following various developments not relevant here, the court entered an agreed judgment dissolving the marriage. Among the provisions of the judgment, filed July 25, 2005, was that Steven would pay Iris $4,000 per month in unallocated maintenance and child support for 42

months, that the parties would have joint custody of the children, that the children would reside with Iris, and that Steven would provide the medical insurance for the children and cover 50% of their out-of-pocket medical and dental costs.

¶ 5        Over the years, Steven and Iris frequently returned to court to contest matters related to the custody and education of the children. Eventually, in October of 2010, the court granted temporary physical custody of the two boys to Steven, limited Iris to supervised visitation, and made a one-time reduction in the amount Steven was then paying for child support.

¶ 6        Shortly after being awarded physical custody and enrolling the boys in a school in his district, Steven filed a petition pursuant to section 510 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/510 (West 2012)) asking that his obligation to pay child support to Iris be terminated completely. That petition was granted in part and denied in part pursuant to an agreed order under which Steven was required to pay $700 per month "based upon the current parenting schedule."

¶ 7        Although the order was agreed upon, it did not end the litigation. Steven subsequently asked the court to order Iris to pay child support to him. Iris, in turn, sought to have Steven held in contempt based on "visitation abuse." Steven then moved to temporarily terminate the $700 per month child support obligations on the grounds that Jacob, who by this time was the only child still visiting Iris, was enrolled in a residential summer camp paid for by Steven, eliminating any child care expenses Iris might otherwise have had.

¶ 8        On July 28, 2012, the circuit court entered an agreed "custody judgment and parenting order" which specified that Steven was to have "the sole care, custody, control and education" of the boys and gave him authority to make "[m]ajor decisions in connection with [their] education, health, care and religious training," subject to various conditions involving communication and cooperation. Iris was granted regular visitation with Nathan once a week, for dinner on Wednesdays. Her regular visitation with Jacob was substantially longer, with weekly visits from Monday to Wednesday mornings, plus alternating weekends, a system which gave her nearly equal time with him. In addition, a separate schedule was set up to insure that each parent would have equal time with both boys during holidays, spring break and summer vacations.

¶ 9        When the court signed the foregoing agreed order, it also entered a separate order disposing of Steven's remaining request to completely terminate his obligation to make child support payments to Iris. Based upon the provisions of the agreed order and a determination that Steven earned approximately $150,000 per year while Iris' earnings were less than $10,000 per year, the court ordered Steven to pay Iris child support of $600 per month and made him "solely responsible for all uncovered medical, dental, orthodontia, psychological and optical expenses for the children."

¶ 10       Steven appealed, arguing that because he has been designated as the custodial parent, the circuit court had no authority under section 505 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/505 (West 2012)) to order him to pay child support to Iris, a noncustodial parent. Steven further contended that even if the circuit court did have statutory authority to order him to make child support payments, it abused its discretion in ordering him to pay the support it did.

¶ 11    As noted at the outset of this opinion, the appellate court rejected the contention that section 505 does not authorize a circuit court to order custodial parents to pay child support to noncustodial parents. 2013 IL App (1st) 122486, ¶ 42. The appellate court further concluded that the circuit court did not abuse its discretion in ordering Steven to pay child support and the full amount of the children's health care expenses not covered by insurance. *Id. ¶¶* 49-50. It held, however, that the particular amount of support ordered in this case, $600 per month, was not supported by the record. It therefore reversed and remanded for an evidentiary hearing to determine "what monies Iris pays when she has visitation with the children," and directed the circuit court "to clearly explain the basis for any support awarded, as required by section 505." *Id.* ¶ 48.

¶ 12    Steven filed a petition for leave to appeal from the appellate court's judgment. Ill. S. Ct. R. 315 (eff. July 1, 2013). His primary argument is that the appellate court's interpretation of section 505 of the Illinois Marriage and Dissolution of Marriage Act is novel, unsupported by the language of the statute itself and contrary to the Fifth District Appellate Court's decision in *Shoff v. Shoff*, 179 Ill. App. 3d 178 (1989). We granted Steven's petition.

¶ 13                                                    ANALYSIS

¶ 14    In Illinois, the support of a child is the joint and several obligation of both the husband and the wife. *In re Marriage of Schuster*, 224 Ill. App. 3d 958, 974 (1992). If the couple's marriage dissolves, the court may apportion child support obligations between them. The standards governing court-awarded child support are set forth in section 505 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/505 (West 2012)). As we have just indicated, Steven's principal challenge to the appellate court's decision is that it misconstrued the provisions of section 505 when it concluded that he could be required to pay child support. Statutory construction is a question of law. Our review of this issue is therefore *de novo. In re Estate of Wilson*, 238 Ill. 2d 519, 552 (2010).

¶ 15    The cardinal rule of statutory construction is to ascertain and give effect to the intent of the legislature. The best evidence of legislative intent is the language used in the statute itself, which must be given its plain and ordinary meaning. *Lulay v. Lulay*, 193 Ill. 2d 455, 466 (2000). When the language of the statute is clear, it must be applied as written without resort to aids or tools of interpretation. *JPMorgan Chase Bank, N.A. v. Earth Foods, Inc.*, 238 Ill. 2d 455, 461 (2010).

¶ 16    Steven interprets section 505 to mean that the obligation to pay child support may be imposed only on noncustodial parents and that a custodial parent may never be ordered to pay child support to a noncustodial parent. The terms of the statute do not support such a view. In contrast to the child support laws of some states which single out noncustodial parents for payment of child support (see, *e.g.*, *Rubin v. Salla*, 964 N.Y.S.2d 41, 47 (N.Y. App. Div. 2013) (applying New York law); *Daigrepont v. Daigrepont*, 458 So. 2d 637, 638-39 (La. Ct. App. 1984) (applying the law of Louisiana)), section 505 expressly confers on courts the option to "order *either or both parents* owing a duty of support to a child of the marriage to pay an amount reasonable and necessary for the support of the child, without regard to marital misconduct." (Emphasis added.) 750 ILCS 5/505(a) (West 2012). The statute further provides that in addition to support, the court may, in its discretion, "order *either or both parents* owing

a duty of support to a child of the marriage to contribute to [various] expenses, if determined by the court to be reasonable," including health needs not covered by insurance. (Emphasis added.) 750 ILCS 5/505(a)(2.5) (West 2012).

¶ 17     That Illinois law does not confine the obligation to pay child support to noncustodial parents is further supported by the statutory guidelines for determining the amount of child support a parent is obligated to pay. In fashioning those guidelines, the General Assembly established as a starting point a percentage formula based on the number of children to be supported and the supporting party's net income. 750 ILCS 5/505(a)(1) (West 2012).

¶ 18     By law, a court is required to apply this formula unless it determines that deviation from it is appropriate. In setting forth the relevant factors a court should take into account in making that determination, the General Assembly spoke broadly. It stated that courts should be guided by:

> "the best interest of the child in light of the evidence, including, but not limited to, one or more of the following relevant factors:
>
> (a) the financial resources and needs of the child;
>
> (b) the financial resources and needs of the custodial parent;
>
> (c) the standard of living the child would have enjoyed had the marriage not been dissolved;
>
> (d) the physical, mental, and emotional needs of the child;
>
> (d-5) the educational needs of the child; and
>
> (e) the financial resources and needs of the non-custodial parent." 750 ILCS 5/505(a)(2) (West 2012).

Nothing in this nonexclusive list of factors makes custody dispositive. Rather, the statute makes clear that a range of considerations may affect the court's assessment, including the means, needs and capacity to produce income of both parents, custodial and noncustodial alike, with the ultimate objective of serving the best interest of the child.

¶ 19     Although four subsequent subsections of section 505 include provisions which apply specifically to noncustodial parents, those subsections do not support Steven's view that custodial parents are categorically exempt from having to pay child support. The subsections in question are (a)(6), (b), (d), and (f). 705 ILCS 5/505(a)(6), (b), (d), (f) (West 2012). Subsection (a)(6) states:

> "If (i) the non-custodial parent was properly served with a request for discovery of financial information relating to the non-custodial parent's ability to provide child support, (ii) the non-custodial parent failed to comply with the request, despite having been ordered to do so by the court, and (iii) the non-custodial parent is not present at the hearing to determine support despite having received proper notice, then any relevant financial information concerning the non-custodial parent's ability to provide child support that was obtained pursuant to subpoena and proper notice shall be admitted into evidence without the need to establish any further foundation for its admission." 750 ILCS 5/505(a)(6) (West 2012).

¶ 20    Subsection (b) provides, in part:

"If there is a unity of interest and ownership sufficient to render no financial separation between a non-custodial parent and another person or persons or business entity, the court may pierce the ownership veil of the person, persons, or business entity to discover assets of the non-custodial parent held in the name of that person, those persons, or that business entity. The following circumstances are sufficient to authorize a court to order discovery of the assets of a person, persons, or business entity and to compel the application of any discovered assets toward payment on the judgment for support:

(1) the non-custodial parent and the person, persons, or business entity maintain records together.

(2) the non-custodial parent and the person, persons, or business entity fail to maintain an arm's length relationship between themselves with regard to any assets.

(3) the non-custodial parent transfers assets to the person, persons, or business entity with the intent to perpetrate a fraud on the custodial parent." 750 ILCS 5/505(b) (West 2012).

¶ 21    According to subsection (d),

"(d) Any new or existing support order entered by the court under this Section shall be deemed to be a series of judgments against the person obligated to pay support thereunder, each such judgment to be in the amount of each payment or installment of support and each such judgment to be deemed entered as of the date the corresponding payment or installment becomes due under the terms of the support order. Each such judgment shall have the full force, effect and attributes of any other judgment of this State, including the ability to be enforced. Notwithstanding any other State or local law to the contrary, a lien arises by operation of law against the real and personal property of the noncustodial parent for each installment of overdue support owed by the noncustodial parent." 750 ILCS 5/505(d) (West 2012).

¶ 22    Finally, subsection (f) provides:

"(f) All orders for support, when entered or modified, shall include a provision requiring the obligor to notify the court and, in cases in which a party is receiving child and spouse services under Article X of the Illinois Public Aid Code, the Department of Healthcare and Family Services, within 7 days, (i) of the name and address of any new employer of the obligor, (ii) whether the obligor has access to health insurance coverage through the employer or other group coverage and, if so, the policy name and number and the names of persons covered under the policy, and (iii) of any new residential or mailing address or telephone number of the non-custodial parent. In any subsequent action to enforce a support order, upon a sufficient showing that a diligent effort has been made to ascertain the location of the non-custodial parent, service of process or provision of notice necessary in the case may be made at the last known address of the non-custodial parent in any manner expressly provided by the Code of Civil Procedure or this Act, which service shall be sufficient for purposes of due process." 750 ILCS 5/505(f) (West 2012).

¶ 23    While these four subsections do include specific provisions addressed solely to noncustodial parents, nothing therein exempts or evinces an intention by the General Assembly to exempt custodial parents from having to pay child support. Rather, they are based on the recognition that noncustodial parents have temptations and opportunities to avoid support obligations that custodial parents do not. Where noncustodial parents are singled out in these four particular subsections it is because the specific problems addressed therein—identifying the parent's resources, insuring that the parent pays the support he or she owes, and keeping track of the parent's whereabouts—are likely to be considerably more difficult when the parent does not have actual custody of the child; is not confronted with the immediate, daily challenge of insuring that the child is properly fed, housed, clothed and educated; and does not risk having the child removed from the home if adequate care is not provided. In other words, subsections (a)(6), (b), (d), and (f) simply address the heightened difficulties in insuring that noncustodial parents fulfill their child support obligations. In no way do they suggest that the obligation to pay child support may never be extended to custodial parents.

¶ 24    Sometimes, as under the agreed custody judgment entered in this case, a parent who is technically noncustodial may have visitation rights which place the child in that parent's care for periods that rival those of the custodial parent and at commensurate cost. If Steven were correct and status as the custodial parent automatically precluded one from having to make any child support payments to the other parent, the noncustodial parent could end up having to pay a significant portion of the costs of raising the child without any regard to that parent's financial resources and needs or how they compared to the financial resources and needs of the custodial parent. That may not be problematic where the noncustodial parent happens to be the wealthier of the two, but where, as here, the noncustodial parent appears to have significantly fewer resources to meet the substantial support costs which are sure to arise from the extensive visitation schedule, disqualifying the poorer parent from obtaining any financial assistance for child care from the wealthier parent based solely on the poorer parent's classification as noncustodial would not only place an unfair burden on the poorer parent, it could also leave that parent with insufficient resources to care for the child in a manner even minimally comparable to that of the wealthier parent.

¶ 25    Section 505(a) was intended to protect the rights of children to be supported by their parents in an amount commensurate with the parents' income. *In re Paternity of Perry*, 260 Ill. App. 3d 374, 382 (1994). Under Steven's approach, a child could well end up living commensurate with the parents' income only half the time, when he or she was staying with the wealthier parent. If custodial parents were categorically exempt from child support obligations, the wealthier parent's resources would be beyond the court's consideration and reach even though the visitation schedule resulted in the child actually residing with the poorer parent for a substantial period each week. This could be detrimental to the child psychologically as well as economically, for the instability resulting from having to "live a dual life in order to conform to the differing socio-economic classes of his or her parents" may cause the child to experience distress or other damaging emotional responses. Laura Raatjes, *High-Income Child Support Guidelines: Harmonizing the Need for Limits With the Best Interests of the Child*, 86 Chi.-Kent L. Rev. 317, 318-19 (2011). Such an outcome would

plainly not serve the child's best interest. Steven's approach therefore undermines rather than advances the purposes of the law.

¶ 26    That custodial parents may be required to pay child support to noncustodial parents where circumstances warrant it has long been recognized by the courts. *Elble v. Elble*, 100 Ill. App. 2d 221 (1968), decided over 40 years ago, is a case in point. There, the father had custody of the child, but the child preferred to live with the mother and did. On a petition for modification, the circuit court refused to change custody to the mother, but ordered the father, who was the custodial parent, to pay $100 per month in child support for the duration of the child's minority. The appellate court affirmed, holding that the language of the version of the statute then in effect was broad enough to authorize the trial judge's order. *Id.* at 226.

¶ 27    To the same effect is *In re Marriage of Cesaretti*, 203 Ill. App. 3d 347 (1990). Applying the current version of the statute, the appellate court in that case rejected the father's contention that once legal and physical custody is placed in one parent, that custodial parent has no obligation to pay child support to the noncustodial parent. *Id*. at 356. Taking into account the parents' relative financial circumstances and the amount of time the child would be spending with each parent, the appellate court upheld the circuit court's order requiring the father to pay $75 per week in child support notwithstanding the fact that temporary custody of the child had been awarded to him.

¶ 28    In *Shoff v. Shoff*, 179 Ill. App. 3d 178, 186 (1989), the Fifth District Appellate Court did uphold a circuit court's ruling that a parent was no longer required to pay child support once that parent obtained legal and physical custody of the child. It reached this conclusion, however, based not on the language of the statute, but as a matter of equity, fairness and common sense given that the parent who had obtained custody was directly providing for all of a child's financial needs. *Id.* at 186-87. The case is therefore of no aid to Steven.

¶ 29    The Supreme Court of Georgia recently had occasion to consider arguments similar to those asserted by Steven, and it reached the same conclusions we have here. In that case, *Williamson v. Williamson*, 748 S.E.2d 679 (Ga. 2013), the father who constituted the custodial parent under Georgia law, was ordered to pay child support to the mother, who was the noncustodial parent. The father objected to the support order on the grounds that "the very idea of a custodial parent paying support to a noncustodial parent defies logic." *Id.* at 681. In rejecting that argument, the court held: (1) that (as in Illinois) the legislature did not specify that only noncustodial parents are to pay child support, (2) that under the law, the touchstone for determining child support is the best interest of the children, (3) that child support is meant in part to insure that, to the extent possible, children of unmarried parents enjoy the same economic standard of living enjoyed by children living in intact families consisting of parents with similar financial means, and (4) that where the noncustodial parent remains responsible under the final order for supporting the children a substantial portion of the time and the noncustodial parent has significantly lower income than the custodial parent, the foregoing goal may best be achieved by requiring the custodial parent to pay child support to the noncustodial parent. *Id.* at 681-82.

¶ 30    Other jurisdictions have likewise recognized that custodial parents may be required to pay child support to noncustodial parents. In *Grant v. Hager*, 868 N.E.2d 801, 804 (Ind. 2007) for example, the Supreme Court of Indiana held that a trial court may order a custodial parent to

pay child support to a noncustodial parent based on their respective incomes and parenting time arrangements if the court concludes that it would be unjust not to do so and makes the written findings mandated by Indiana law. Similarly, in *Colonna v. Colonna*, 855 A.2d 648 (Pa. 2004), the Supreme Court of Pennsylvania recognized that where the parent who does not have primary custody has a less significant income than the custodial parent, it is likely that he or she will not be able to provide an environment that resembles the one in which the children are accustomed to living with the custodial parent. "While a downward adjustment in lifestyle is a frequent consequence of divorce that affects both adults and children," the court observed,

"we would be remiss in failing to ignore the reality of what happens when children are required to live vastly different lives depending upon which parent has custody on any given day. To expect that quality of the contact between the non-custodial parent and the children will not be negatively impacted by that parent's comparative penury vis-à-vis the custodial parent is not realistic. Issuing a support order that allows such a situation to exist clearly is not in the best interests of the children.

Therefore, where the incomes of the parents differ significantly, we believe that it is an abuse of discretion for the trial court to fail to consider whether deviating from the support guidelines is appropriate, even in cases where the result would be to order child support for a parent who is not the primary custodial parent." *Id.* at 651-52.

¶ 31    While obviously not binding on our court, we believe that the foregoing authorities are consistent with the principles set forth in section 505 of the Illinois Marriage and Dissolution of Marriage Act and further support our conclusion that under section 505, a trial court may order the custodial parent to pay child support to the noncustodial parent where circumstances and the best interest of the child warrant it.

¶ 32    The concern has been expressed that if we sanction awards of child support to noncustodial parents, we open the door to abuse by spouses who will use requests for modification of child support as a subterfuge for obtaining additional maintenance. We note, however, that the criteria for awarding and modifying child support are clearly set out in the statute. See 750 ILCS 5/505, 510 (West 2012). If those criteria are applied properly by the lower courts, and we must assume they will be, any abuse should be preventable. Moreover, and in any case, speculation of this kind cannot justify failing to follow the statute as written. By its terms, section 505(a) does not restrict child support obligations to noncustodial parents. It is axiomatic that we may not depart from a statute's plain language by reading into the law exceptions, limitations, or conditions that the legislature did not express (*Schultz v. Illinois Farmers Insurance Co.*, 237 Ill. 2d 391, 408 (2010)), nor may we rewrite the law to make it consistent with our own idea of orderliness and public policy (*id.* at 406). Establishing the criteria governing child support obligations following dissolution of marriage is a matter for the legislature. As this court previously held when addressing another issue related to marriage dissolution, "if there is to be a change in the law of this State on this matter, it is for the legislature and not the courts to bring about that change." *Mogged v. Mogged*, 55 Ill. 2d 221, 225 (1973).

¶ 33    Steven next argues that even if a circuit court does have the authority to order a custodial parent to pay child support to a noncustodial parent, the circuit court in this case "abused its discretion when it arbitrarily ordered [him] to pay Iris $600 per month in addition to him

- 9 -

paying all uncovered medical expenses." This argument is not properly before us. As Iris correctly points out, the appellate court reversed the portion of the circuit court's judgment which ordered Steven to pay her child support and remanded the cause to the circuit court for an evidentiary hearing, with directions for the court to "clearly explain the basis for any support awarded." 2013 IL App (1st) 122486, ¶ 48. Having prevailed on this point in the appellate court, there is no need (or legal basis) for Steven to pursue it again in our court. We cannot do more for him than the appellate court has already done.

¶ 34 Iris, for her part, makes a cursory claim that the $600 per month child support award should have been allowed to stand without remand, but she has not cited and we have not found any authority that would persuade us that reversal and remand was erroneous under the circumstances of this case. How much child support, if any, Steven should be required to pay will be revisited by the parties when the matter returns to the circuit court for further hearing. If the parties take issue with the circuit court's new determination, they may seek additional review at that time.

¶ 35 Finally, Steven contends that the circuit court abused its discretion when it modified his support obligations to require him to pay the full amount of any medical, dental, orthodontic, psychological, and optical expenses for the children that are not covered by insurance. Although the appellate court allowed this portion of the circuit court's judgment to stand, we believe it erred in doing so. Allocation of the obligation to pay the medical and dental expenses of minor children is inextricably linked to the determination of how much monetary support each parent should contribute toward the children's care. Both require assessment of the parents' respective financial circumstances. They cannot be considered in isolation. When the appellate court reversed the portion of the judgment ordering Steven to pay $600 per month in child support and remanded for further proceedings on that issue, it should therefore have done the same with respect to the portion of the circuit court's judgment dealing with medical and dental costs.

¶ 36                                          CONCLUSION

¶ 37 For the foregoing reasons, we affirm that portion of the appellate court's judgment which upheld the authority of the circuit court to order Steven to pay child support and remanded to the circuit court for an evidentiary hearing regarding the amount of child support Steven should be required to pay. We reverse that portion of the appellate court's judgment which upheld the circuit court's modification of the support order requiring Steven to pay the full amount of any of the children's medical and dental expenses not covered by insurance. On remand, the circuit court is directed to revisit that question when it reconsiders Steven's child support obligations.

¶ 38 Appellate court judgment affirmed in part and reversed in part.

¶ 39 Circuit court judgment reversed.

¶ 40 Cause remanded with directions.

¶ 41     JUSTICE THEIS, specially concurring:

¶ 42     I agree with the majority that section 505 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/505 (West 2012)) does not preclude a trial court from ordering the custodial parent to pay child support to the noncustodial parent. *Supra* ¶ 31. I write separately, however, because the majority's analysis is, at best, incomplete, and at worst, misleading as to how section 505 operates. As discussed below, the legislature intended the guidelines, set forth in section 505(a)(1) (750 ILCS 5/505(a)(1) (West 2012)), to be the starting point in each case for a child support award, and that starting point requires the trial court to presume, as an initial matter, that the noncustodial parent will pay support to the custodial parent. An analysis of how the statutory guidelines operate is both relevant to Steven's argument that the statute does not permit a court to order the custodial parent to pay child support to the noncustodial parent, and essential to providing appropriate guidance to the trial court on remand. The majority's silence on this matter gives tacit approval to the procedure utilized by the trial court, *i.e.*, simply applying the statutory guidelines to the income of the wealthier parent. This is not, however, an appropriate application of the guidelines, and undermines the legislative goal of consistency in child support awards, as well as the rule of law that child support is the obligation of *both* parents. Because the majority opinion fails to consider the issues fully, I do so now.

¶ 43                                ANALYSIS

¶ 44     Section 505 of the Act sets forth a specific procedure trial courts must follow in determining a parent's child support obligation. Pursuant to section 505(a)(1), the trial court "shall determine the minimum amount of support by using the [statutory] guidelines." 750 ILCS 5/505(a)(1) (West 2012). Section 505(a)(2) highlights the importance of the statutory guidelines, stating that they "*shall* be applied in *each* case unless the court finds that a deviation from the guidelines is appropriate," based on the best interest of the child in light of various factors. (Emphases added.) 750 ILCS 5/505(a)(2) (West 2012). "If the court deviates from the guidelines, the court's finding shall state the amount of support that would have been required under the guidelines." *Id.* Under this statutory scheme, a trial court's award of child support begins, in each case, with the statutory guidelines. *In re Marriage of Stanley*, 279 Ill. App. 3d 1083, 1085 (1996).

¶ 45     The current guidelines, in section 505(a)(1) of the Act, provide as follows:

| "Number of Children | Percent of Supporting Party's Net Income |
|---|---|
| 1 | 20% |
| 2 | 28% |
| 3 | 32% |
| 4 | 40% |
| 5 | 45% |
| 6 or more | 50%" |

¶ 46     Under these guidelines, a trial court determines the minimum support obligation by identifying the number of children, and then calculating the corresponding percentage of the

supporting party's net income. The majority acknowledges that the General Assembly established this formula as a starting point in the child support calculation, but fails to explain how the formula should be applied. *Supra* ¶ 17. The trial court in the instant case applied the statutory percentage to the parent with the greater income—the custodial father. The legislature, however, did not intend the guidelines to operate in this fashion. As our appellate court has long recognized, the statutory child support guidelines create a "rebuttable presumption that a specified percentage of a *noncustodial* parent's income constitutes an appropriate child-support award." (Emphasis added.) *In re Marriage of Blaisdell*, 142 Ill. App. 3d 1034, 1045 (1986). Accord *In re Marriage of Freesen*, 275 Ill. App. 3d 97, 105 (1995); *In re Marriage of Sweet*, 316 Ill. App. 3d 101, 108 (2000); *Anderson v. Heckman*, 343 Ill. App. 3d 449, 453 (2003); *In re Marriage of Berberet*, 2012 IL App (4th) 110749, ¶ 37. See also *Blisset v. Blisset*, 123 Ill. 2d 161, 172 (1988) (stating, in *dicta*, that the guidelines "determine what percentage of a noncustodial parent's income should be used for child support").

¶ 47      The *Blaisdell* decision, entered less than two years after the General Assembly first adopted child support guidelines, is instructive. In *Blaisdell*, the appellate court considered several constitutional challenges to the statutory guidelines adopted in 1984 (Pub. Act 83-1404 (eff. Sept. 12, 1984)). Although the guidelines have been modified and refined since the *Blaisdell* decision, the salient features have remained the same. Like the present guidelines, the 1984 guidelines required the trial court to determine the minimum amount of support based on the number of children and a percentage of net income. Pub. Act 83-1404, § 2 (eff. Sept. 12, 1984). Similar to the current statute, the 1984 guidelines were "binding in each case unless the court makes express findings of fact as to the reason for departure below the guidelines." *Id.* Thus, the appellate court's observations in *Blaisdell* regarding the manner in which the guidelines operate are still relevant today.

¶ 48      *Blaisdell* explained that the statutory guidelines did not remove judicial discretion from the setting of child support awards, but rather provided a "place to begin an analysis" (*Blaisdell*, 142 Ill. App. 3d at 1040), *i.e.*, a "starting point in the support award determination" (*id.* at 1045). The appellate court elaborated:

> "The guidelines legislation has, in reality, shifted the burden of presenting evidence in a child-support hearing to the parent who wishes to shift the noncustodial parent's contribution below or above the specified percentages. And the legislation has established standards for the court to follow in deviating from those percentages." *Id.* at 1041.

The appellate court reiterated that the guidelines "merely structure, subject to court adjustment, the noncustodial parent's contribution in an effort to shift some of the burden of care and support from the custodial parent." *Id.* at 1047.

¶ 49      *Blaisdell* also considered the origins of the statutory guidelines, noting that they were modelled after guidelines utilized by the judges in the domestic relations division of the Cook County circuit court. *Id.* at 1040 (quoting 83d Ill. Gen. Assem., House Proceedings, May 17, 1984, at 193 (statements of Representative Vinson)). Under the Cook County guidelines, the support obligation was determined based on the number of children, and a percentage of the income of the noncustodial parent. *Id.* at 1038-39 (quoting the Cook County circuit court's

"Guidelines for Support and Maintenance Orders"). [1] As observed in *Blaisdell*, the legislature's adoption of substantially similar guidelines for determining a parent's minimum support obligation "codified the procedure that was functioning successfully in the circuit court of Cook County." *Id.* at 1040.

¶ 50 Generally, child support guidelines serve two important functions: (1) they promote uniformity which, in turn, encourages settlement, and (2) they ensure the adequacy of child support orders. See Kenneth F. Levin, *The Use (and Abuse) of Child Support Schedules in Illinois*, 71 Ill. B.J. 314 (1983) (observing that child support guidelines provide benchmarks for attorneys to use as a tool to encourage reasonable settlement, and a uniform comparative basis for the judiciary "to permit a smoothing out of the curve of disparate results"); Linda Henry Elrod, *The Federalization of Child Support Guidelines*, 6 J. Am. Acad. Matrim. Law 103, 111 (1990) (observing that, when Congress passed the Child Support Enforcement Amendments of 1984 requiring states receiving monies under federal welfare programs to adopt child support guidelines, the major problems that existed nationally were that "child support awards were inadequate to cover the actual costs of raising a child," and "child support orders varied drastically for no apparent reason").

¶ 51 Illinois's child support guidelines serve similar functions. The Cook County guidelines, on which the statutory guidelines were based, were adopted " 'in an attempt to gain uniformity in support orders and promote amicable settlements.' " *Blaisdell*, 142 Ill. App. 3d at 1038-39 (quoting the Cook County circuit court's "Guidelines for Support and Maintenance Orders"). The appellate court in *Blaisdell* likewise concluded that the statutory guidelines were intended to "standardize" child support orders, and "increase child support in light of comprehensive studies showing inadequate awards." *Id.* at 1047. The legislative history of the statutory guidelines supports the appellate court's conclusions. See 83d Ill. Gen. Assem., House Proceedings, May 17, 1984, at 193-94, 204 (statements of Representative Vinson, explaining that the guidelines establish standards that will provide more certain and adequate child support payments).

¶ 52 If the dual purpose of the statutory guidelines—to promote uniformity and adequacy of awards—is to be realized, then the guidelines must be applied consistently from case to case. The guidelines are, as explained above, the starting point for determining child support, and that starting point must be fixed. The trial court cannot begin the award calculation in one case by applying the guidelines to the income of the noncustodial parent, and in the next case, by applying the guidelines to the income of the custodial parent, as the trial court did in this case. The statutory guidelines must be applied, initially, to the noncustodial parent's net income to arrive at a presumptively reasonable minimum support obligation that the noncustodial parent must pay to the custodial parent. A court may always deviate from the guidelines, if the circumstances warrant doing so. But the court must apply the guidelines in the same manner

---

[1]Although the Cook County guidelines assumed that, typically, the "husband" was the noncustodial parent, the guidelines instructed that the term "wife" should be substituted for "husband" if the wife was the noncustodial parent. Kenneth F. Levin, *The Use (and Abuse) of Child Support Schedules in Illinois*, 71 Ill. B.J. 314, 330 (1983) (setting forth, in full, Cook County "Guidelines for Support and Maintenance Orders").

from case to case. Although the majority is confident that the trial courts will apply the child support statute properly (*supra* ¶ 32), the majority fails to explain what a proper application entails. Indeed, the majority's silence is misleading because it incorrectly suggests that the trial court's application of the statutory formula to the custodial parent's income was proper.

¶ 53     The importance of a trial court's proper application of statutory child support guidelines is illustrated in *Williamson v. Williamson*, 748 S.E.2d 679 (Ga. 2013), cited by the majority. *Supra* ¶ 29. In *Williamson*, the Georgia Supreme Court concluded that although the custodial parent could be required to pay child support to the noncustodial parent, "the statute does require the court to follow certain steps." *Williamson*, 748 S.E.2d at 681. The court observed that "[t]he process of calculating child support under the guidelines *** is structured around the initial presumption that the noncustodial parent will pay some amount to the custodial parent, who typically bears the everyday expenses of caring for the children as they live with him or her." *Id.* at 682. The court explained that after determining the presumptive amount that the noncustodial parent pays to the custodial parent, the court may deviate from that amount, and the final child support order may result in a "negative" payment to the custodial parent—"which is another way of saying that the custodial parent must pay the noncustodial parent that amount to support the children." (Emphasis omitted.) *Id.* The Georgia Supreme Court concluded that the trial court misapplied the statute in a "fundamental way" when it applied the statutory guidelines to the custodial father's income, rather than the noncustodial mother's income. *Id.* at 681. The court stated:

> "[T]he evidence in this case might authorize the trial court to apply a *** deviation for *Mother* *** to reduce *Mother's* $233 presumptive child support amount so much that the net result is that Father must pay child support to Mother. But in calculating that the custodial Father was required to pay the noncustodial Mother $1,087 in monthly child support, the court incorrectly started with *Father's* presumptive amount ***." (Emphases in original.) *Id.*

¶ 54     Like the Georgia court, the trial court in the present case also erred, in a fundamental way, in its determination of child support. The trial court began by calculating what Steven's support obligation would be to Iris, under the statutory guidelines, if Iris was still the custodial parent. That figure, according to the trial court was "somewhere in the neighborhood" of $2,500. The trial court then deviated from that amount based on Iris's actual parenting time with the couple's two sons and awarded Iris child support of $600 per month.[2] The trial court, however, should have first determined the presumptively reasonable amount of support that Iris, the noncustodial parent, should pay to Steven, the custodial parent, under the guidelines set forth in section 505(a)(1). After making that determination, the court could then consider whether, pursuant to section 505(a)(2), a deviation from that amount is appropriate, based on the best interest of the couple's two sons, in light of evidence regarding the financial, emotional and educational needs of the children, and the financial resources and needs of Iris and Steven. As this court has explained, "If application of the guidelines generates an amount that the court considers inappropriate, then the court should make a specific finding to that

---

[2]The $600 figure is roughly 25% of $2,500, which mirrors the percentage of total parenting time Iris spends with her two sons.

effect and adjust the amount accordingly." *In re Marriage of McGrath*, 2012 IL 112792, ¶ 16. That is the procedure the trial court should follow on remand. The fact that a significant disparity exists between Iris's income and Steven's income does not change this procedure; it is merely a factor to consider in whether to deviate from the presumptively reasonable amount of support generated under section 505(a)(1) when the specified percentage is applied to Iris's income.

¶ 55 The procedure employed by the trial court, which the majority does not address, effectively absolved Iris, the noncustodial parent, of any support obligation. To be sure, it may yet be that the facts and circumstances of this case require that Steven, notwithstanding his status as the custodial parent, pay child support to Iris. But Iris's support obligation as a parent must be acknowledged in the first instance by applying the statutory guidelines to her. As the majority notes, "[i]n Illinois, the support of a child is the joint and several obligation of *both* the husband and the wife." (Emphasis added.) *Supra* ¶ 14. That shared obligation is reflected in the child support statute. See also 750 ILCS 5/505(a) (West 2012) (authorizing the trial court to order either or both parents to pay child support). Applying the guidelines as the trial court did in this case undermines that rule of law. I recognize that the statutory guidelines, by their very nature, do not address every conceivable situation. Here, however, where the father has sole custody of the children, the statutory guidelines clearly apply and must be the starting point for an award of child support.

¶ 56                                                    CONCLUSION

¶ 57 I agree with the majority that under appropriate circumstances the trial court may order the custodial parent to pay child support to the noncustodial parent. But the trial court must follow the proper procedure so that the obligation of both parents is taken into account and the "physical, mental and emotional health needs of the child" are met. 750 ILCS 5/505(a) (West 2012).

¶ 58 JUSTICE THOMAS joins in this special concurrence.